UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SNODGRASS-KING PEDIATRIC | ) | |
| DENTAL ASSOCIATES, P.C. and | ) | |
| DAVID J. SNODGRASS, D.D.S., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:14-cv-654 |
| v. | ) | Senior Judge Haynes |
| | ) | Magistrate Judge Brown |
| DENTAQUEST USA INSURANCE | ) | Jury Demand |
| CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

To: The Honorable William J. Haynes, Jr., Senior United States District Judge

## REPORT & RECOMMENDATION

Pending before the Court are Defendant DentaQuest USA Insurance Company, Inc.'s

("DentaQuest's") Motion for Summary Judgment (Docket Entry 120) and Snodgrass-King

Pediatric Dental Associates, P.C., and Dr. David J. Snodgrass' (collectively referred to as

"Snodgrass-King") Motion for Partial Summary Judgment (Docket Entry 129). For the following

reasons, the Magistrate Judge **RECOMMENDS** the following: (1) Snodgrass-King's motion be

**DENIED**; (2) DentaQuest's motion be **DENIED** as to the issue of state action, the equal

protection and First Amendment retaliation claims, and the availability of compensatory and

punitive damages; and (3) DentaQuest's motion be **GRANTED** as to the procedural due process

and Medicaid (42 U.S.C. § 1396u-2) claims and to the request for injunctive relief.

### I.      Procedural History

The complaint in this case was filed under seal on March 10, 2014. (Docket Entry 1). A

redacted version of the complaint is also available. (Docket Entry 61). Snodgrass-King alleges

1

that DentaQuest[1] wrongfully excluded Snodgrass-King from the TennCare dental benefits program. (Docket Entry 61, p. 12-15). According to Snodgrass-King, DentaQuest is a state actor under 42 U.S.C. § 1983 and its conduct violated the equal protection, free speech, and procedural due process rights guaranteed by the United States and Tennessee Constitutions, as well as violated federal Medicaid law, 42 U.S.C. § 1396u-2. (Docket Entry 61, p. 15-20). Snodgrass-King also alleged several state law claims. (Docket Entry 61, p. 21-23). The District Judge later dismissed part of the equal protection claim and all of the state law claims. (Docket Entry 72).

On August 17, 2015, DentaQuest moved for summary judgment. (Docket Entry 120). Snodgrass-King responded, and DentaQuest replied. (Docket Entries 143 and 179). The State of Tennessee thereafter filed a brief *amicus curiae* in support of DentaQuest's Motion. (Docket Entry 186). Snodgrass-King then responded to the State's brief. (Docket Entry 199).

## II.    Factual Background

"TennCare" is the State of Tennessee's Medicaid program. (Docket Entry 142 ¶ 2). Among other benefits, TennCare provides dental coverage for individuals under the age of 21. (Docket Entry 142 ¶ 6). The Bureau of TennCare is charged with administering TennCare. (Docket Entry 142 ¶ 3). The State of Tennessee does not require that dental benefits managers ("DBMs") include any willing provider in TennCare provider networks. (Docket Entry 142 ¶ 4).

Beginning in 2002, the State of Tennessee began contracting with private DBMs to administer the TennCare dental program. (Docket Entry 142 ¶ 7). DBMs are selected through a competitive bidding process. (Docket Entry 142 ¶ 8). From 2002 to 2010, Doral Dental of Tennessee, LLC ("Doral") and DentaQuest of Tennessee, LLC ("DentaQuest of TN") served as DBMs for TennCare. (Docket Entry 145-6 ¶ 3). DentaQuest, LLC acquired Doral and

_____

[1] Although the original complaint also named state officials as defendants, the Plaintiffs voluntarily dismissed those defendants, and the Court dismissed the Plaintiffs' claims against the state officials without prejudice. (Docket Entries 38 and 40).

DentaQuest of TN in 2004. (Docket Entry 145-6 ¶ 2). The Defendant in this lawsuit, DentaQuest USA, is a wholly-owned subsidiary of DentaQuest, LLC. (Docket Entry 145-6 ¶ 1).

In 2003, Doral terminated Snodgrass-King from its provider network. (Docket Entry 145-6 ¶ 4). DentaQuest, LLC's current CEO, Steven Pollock, participated in the termination decision. (Docket Entry 145-6 ¶ 7). In response to the termination notice, Dr. Snodgrass placed a sign in his office window which stated that his TennCare contract had been terminated and requested that his patients contact TennCare regarding the termination. (Docket Entry 145-6, p. 40) (Docket Entry 180 ¶ 12). David Florsheim, circulated this information to other Doral employees, Ronald Brummeyer, Steven Pollock, Marcel Telzlaff, Brett Bostrack, and Bryan Roberts. (Docket Entry 145-6, p. 40). A little over a week later, an email was sent to James Gillcrist,[2] and Doral employees Michele Blackwell, and Diane Bergshneider, among others, stating that Dr. Snodgrass had sent letters to pediatricians to let them know he had been "kicked off" the TennCare network. (Docket Entry 145-6, p. 41). Michele Blackwell was aware of a Channel 4 news story in which Dr. Snodgrass criticized Doral's administration of TennCare. (Docket Entry 145-6 ¶ 10).[3]

In 2006, two Snodgrass-King providers were not invited into the Doral network even though Doral employee Michele Blackwell stated that Doral could have used pediatric dentists. (Docket Entry 145-6 ¶ 17). A year later, in 2007, Doral refused to invite five Snodgrass-King providers into the Doral Network, prompting State Representative Charles Sargent, Jr. to ask Doral for an explanation. (Docket Entry 145-6 ¶ 19-20). Michele Blackwell responded to the State Representative on behalf of Doral. (Docket Entry 145-6, p. 46). Later, Mary Jo Blank sent an email to Ronald Price, Michele Blackwell, Brett Bostrack, and James Thommes, in which she

---

[2] Dental Director of TennCare
[3] For more information about Dr. Snodgrass' history with Doral, see *Snodgrass v. Doral Dental of Tennessee*, No. 3:08-0107, 2008 WL 2718911, at *1-2 (M.D. Tenn. July 10, 2008).

stated, "It is my understanding that [Dr. Snodgrass] is applying pressure within the political framework in Tennessee to be allowed back into the network." (Docket Entry 145-6, p. 44). Several months later, Michele Blackwell stated that she had been informed that Dr. Snodgrass had requested to appear before the TennCare Oversight Committee which would likely occur due to Dr. Snodgrass' legislative contacts. (Docket Entry 145-6, p. 45).

On February 1, 2008, Dr. Snodgrass filed a lawsuit against Doral regarding its administration of TennCare dental care. (Docket Entry 145-6 ¶ 26) (Docket Entry 180 ¶ 15). This lawsuit was settled. (Docket Entry 145-6 ¶ 31). Dr. Snodgrass filed a second lawsuit, this one against DentaQuest of TN, in March 2010 with similar allegations. (Docket Entry 145-6 ¶ 42) (Docket Entry 180 ¶ 15). This lawsuit also settled. (Docket Entry 145-6 ¶ 43). The following individuals were aware of Dr. Snodgrass' prior lawsuits against Doral and DentaQuest of TN before Snodgrass-King was not invited into the 2013-2016[4] DentaQuest provider network: the current CEO of DentaQuest, LLC, Steven Pollock, and the following DentaQuest, LLC current and former employees: Michele Blackwell, Mary Jo Blank, Ronald Price (in-house lawyer), Jim Hawkins (in-house lawyer), Bob Lynn, Mark Sniegocki, Todd Cruse, Brett Bostrack, James Thommes, Marcel Tetzlaff, Cheryl Polmatier, Barry Major, Vicki Coates, Mary Murack, John Luther, and Fay Donahue. (Docket Entry 145-6 ¶ 48, 50-64) (Docket Entry 180 ¶ 17).

Immediately prior to the 2013-2016 DentaQuest contract, Delta Dental administered TennCare's dental program from 2010 to 2013 and included Dr. Snodgrass as a provider. (Docket Entry 132-7, p. 23-24) (Docket Entry 175 ¶ 97-98). At the end of 2012, DentaQuest anticipated that there would soon be a new TennCare contract opportunity. (Docket Entry 145-6 ¶ 116). In contemplation of the upcoming request for proposals ("RFP"), on December 6, 2012, Ron Price, Jim Hawkins, and Bob Lynn reviewed the settlement agreement from Dr. Snodgrass'

---

[4] The contract may be extended for two one-year periods. (Docket Entry 142 ¶ 15-20, 45).

2008 lawsuit against Doral. (Docket Entry 145-6 ¶ 116). Later, on January 2, 2013, Todd Cruse told Bob Lynn and Steven Pollock in an email regarding network preparations for the RFP, "Ron has sent me the Snodgrass settlement and I need to review to make sure we don't have problems with his settlement language." (Docket Entry 145-6, p. 52).

According to DentaQuest, Cheryl Polmatier and Barry Major, were involved in the creation of the DentaQuest TennCare network. (Docket Entry 142 ¶ 53). On December 20, 2012, Cheryl Polmatier emailed Kimberly Johnson, Michele Blackwell, and Mark Sniegocki to set up a meeting to discuss "concerns that Todd, Mark and Bob shared about the State's position on large groups, Snodgrass and others that we need to 'keep out' of the network." (Docket Entry 145-4, p. 22). A week later, Cheryl Polmatier told Mark Sniegocki, Bob Lynn, Barry Major, and Todd Cruse in an email, "It's my understanding from previous conversations that there are certain providers and large provider groups that Tenncare would prefer that we not have in our network. . . . Let me know who knows which offices (besides Snodgrass) . . . ." (Docket Entry 145-4, p. 25) (emphasis removed). In further communications from Cheryl Polmatier to Bob Lynn, Mark Sniegocki, and Ron Price on January 8, 2013, Cheryl Polmatier discussed amending the CoverKids network without Snodgrass, stated that she and Mark Sniegocki did not know "who the other providers are specifically that the State is not interested in," and suggested they "await the analysis and any further information from the state/Gilcrest [sic][5] on who they don't want to work with." (Docket Entry 145-1, p. 1-3). In January 2013, Cheryl Polmatier had spoken with Michele Blackwell, Ron Price, Jim Hawkins, Bob Lynn, and Mark Sneigocki about Dr. Snodgrass and Snodgrass-King. (Docket Entry 145-6 ¶ 109). At this time, Cheryl Polmatier was aware of Dr. Snodgrass' previous litigation. (Docket Entry 145-6 ¶ 110). She intended to keep Dr. Snodgrass and Snodgrass-King out of the future DentaQuest network. (Docket Entry 132-7,

[5] Dental Director of TennCare

5

p. 31). In January 2013, Barry Major also had a preference to not invite Dr. Snodgrass into any future DentaQuest network. (Docket Entry 145-6 ¶ 111). A DentaQuest document predating the decision to exclude Snodgrass-King from the provider network describes Dr. Snodgrass as "well-connected politically, very vocal, and not a supporter of DentaQuest." (Docket Entry 145-6 ¶ 45).

The RFP for the 2013-2016 TennCare contract was issued on February 1, 2013. (Docket Entry 124 ¶ 7). Dr. James Gillcrist, the Dental Director of TennCare, helped create the RFP. (Docket Entry 180 ¶ 5). James Gillcrist also scored the RFP, giving DentaQuest higher scores than the other bidders. (Docket Entry 180 ¶ 6). DentaQuest was selected to administer the TennCare dental benefits program from May 15, 2013 to September 30, 2016 with the possibility of two one-year renewal periods. (Docket Entry 142 ¶ 15-20, 45). Unlike previous DBM contracts, the DentaQuest contract contained risk-sharing provisions. (Docket Entry 142 ¶ 21). Based on DentaQuest's performance, it could incur up to eight million dollars in losses or gain up to eight million dollars in bonuses. (Docket Entry 142 ¶ 22). Although DentaQuest's contract gave it discretion in creating its provider groups, the parties disagree as to whether the Bureau of TennCare influenced DentaQuest's provider choices. (Docket Entry 142 ¶ 29-34). Under the terms of the DentaQuest contract, the State may "terminate the Contract without cause without recourse; take over any portion of the administration of the Contract without recourse; and assess liquidated damages if DentaQuest's provider network does not meet the Contract's requirements." (Docket Entry 180 ¶ 7). The DentaQuest contract also provides that providers with multiple practice locations could only be credentialed in one location; however, this requirement could be discretionarily waived for current TennCare providers in good standing with a record of quality dental care. (Docket Entry 142 ¶ 39-40).

Snodgrass-King was eligible to be invited into the TennCare network. (Docket Entry 142 ¶ 88). In December 2013, Snodgrass-King received a notice from DentaQuest that it was not being invited to participate in the DentaQuest network beginning on January 1, 2014. (Docket Entry 132-9, p. 58). On January 3, 2014, Snodgrass-King requested that DentaQuest reconsider this decision and explain its reason for not inviting Snodgrass-King into the network. (Docket Entry 132-9, p. 58-59). DentaQuest responded on January 14, 2014, declining to reverse its initial decision. (Docket Entry 132-9, p. 62). In addition to stating that DentaQuest did not have access needs in Snodgrass-King's provider locations, DentaQuest also stated that its contract with TennCare limited DentaQuest's ability to include multiple practice providers in its network. (Docket Entry 132-9, p. 62-63).

Snodgrass-King believes that DentaQuest's explanation is pretextual and that Snodgrass-King's previous public criticism and lawsuits against DentaQuest were the real reasons for its exclusion. (Docket Entry 142 ¶ 89-93). Under these facts, Snodgrass-King argues that DentaQuest, serving as a state actor for purposes of 42 U.S.C. § 1983, has (1) violated its right to equal protection under the Fourteenth Amendment, (2) retaliated against Snodgrass-King for its protected First Amendment conduct, (3) committed a Fourteenth Amendment procedural due process violation, and (4) violated federal Medicaid law, 42 U.S.C. § 1396u-2. (Docket Entry 61, p. 15-20).

### III.    Issues Presented

DentaQuest's Motion for Summary Judgment raises the following issues: (1) whether DentaQuest's decision to not invite Snodgrass-King into the TennCare provider network constitutes state action, and if so, whether Snodgrass-King has provided enough evidence to establish (2) an equal protection violation, (3) First Amendment retaliation, (4) a procedural due

process violation, and (5) a claim under Medicaid law, 42 U.S.C. § 1396u-2. (Docket Entry 121).

Additionally, DentaQuest seeks summary judgment on Snodgrass-King's request for (1)

compensatory damages for the optional contract extension periods, (2) punitive damages, and (3)

injunctive relief. (Docket Entry 121).

Snodgrass-King solely seeks summary judgment on its procedural due process claim.

(Docket Entry 129).

## IV.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Claims that a fact is, or is not, in genuine dispute must be supported by the record. Fed. R.

Civ. P. 56(c)(1). In evaluating a motion for summary judgment, the court views the facts in the

light most favorable for the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d

228, 242 (6th Cir. 2015). However, a "mere 'scintilla of evidence' within the record that

militates against the overwhelming weight of contradictory corroboration does not create a

genuine issue of fact." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). If a

rational trier of fact could not find for the nonmoving party, summary judgment should be

granted. *Slusher v. Shelbyville Hosp. Corp.*, 805 F.3d 211, 215 (6th Cir. 2015) (citing *Miller v.

Sanilac Cty.*, 606 F.3d 240, 247 (6th Cir. 2010)).

## V.    Analysis

### A.  State Action

In order to maintain the claims brought under 42 U.S.C. § 1983, Snodgrass-King must

establish both of the following: "(1) the deprivation of a right secured by the Constitution or laws

of the United States; (2) caused by a person acting under the color of state law." *Baynes v.*

*Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citations omitted). If conduct constitutes "state action" within the meaning of the Fourteenth Amendment, it also satisfies the "under the color of state law" requirement for claims brought under § 1983. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982)).

"[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id.* at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Courts have assessed this in a variety of ways, such as: (1) whether the private entity was serving a traditionally public function (the "public function test"); (2) whether the government coerced or substantially encouraged the action taken by the private entity (the "state compulsion test");[6] (3) whether the public and private entities have a symbiotic relationship (the "symbiotic relationship or nexus test"); and (4) whether the public and private entities are so entwined that it is fair to apply constitutional standards to the private entity's actions (the "entwinement test").[7] *Id.* at 296; *Marie v. Am. Red Cross*, 771 F.3d 344, 362-64 (6th Cir. 2014); *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 828 (6th Cir. 2007) (citation omitted).

Reviewing the evidence in the record in the light most favorable to Snodgrass-King, the nonmovant, there remains a genuine dispute of material fact as to whether the State coerced or significantly encouraged DentaQuest to not invite Snodgrass-King into the provider network.

---

[6] Snodgrass-King refers to the "state compulsion/nexus" test. (Docket Entry 143, p. 3). Following previous decisions from the Sixth Circuit and this Court, the state compulsion test is distinguished from the symbiotic relationship/nexus test. *See Marie*, 771 F.3d at 363; *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 784 (6th Cir. 2007); *Al-Qadir v. G4S Secure Sols. (USA), Inc.*, No. 3:11-CV-0357, 2013 WL 64779, at *3 (M.D. Tenn. Jan. 3, 2013). However, as emphasized by the Supreme Court, these "tests" are not hard and fast rules. *Brentwood Acad.*, 531 U.S. at 295. Rather, they are designed to address the various ways in which conduct of traditionally private actors may be considered state action. So long as the underlying purpose of determining state action is effectuated, the label assigned to the "test" is of no importance.

[7] The Sixth Circuit has included the entwinement test in discussions of the symbiotic relationship test. *Campbell*, 509 F.3d at784; *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 565 (6th Cir. 2007).

The state compulsion test provides that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Paige v. Coyner*, 614 F.3d 273, 279 (6th Cir. 2010). The State must have done more than simply approve of or acquiesce to the private actor's decision. *Robinson v. Buffaloe & Associates, PLC*, No. 3:13-0146, 2013 WL 4017045, at *10 (M.D. Tenn. Aug. 6, 2013) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982)).

In support of its claim that the State coerced or significantly encouraged DentaQuest to exclude Snodgrass-King from the dental network, Snodgrass-King directs the Court's attention to Cheryl Polmatier's deposition testimony and several emails. (Docket Entry 145-4). Although these email exchanges all occurred before the RFP was issued and before the contract was awarded, Snodgrass-King reasonably suggests that pre-contract discussions could significantly influence the Bureau of TennCare's contract award decision and DentaQuest's ultimate provider choices. Accordingly, the emails are relevant to this inquiry.

First, Cheryl Polmatier was questioned about an email exchange dated December 17-20, 2012, between herself, Michele Blackwell, Kimberly Johnson, and Mark Sniegocki. (Docket Entry 145-4, p. 16-18, 22). In an email, Cheryl Polmatier states:

> I just received the TN data that I had requested on the old TennCare network, current CoverKids network, large groups, etc. so we can have an internal discussion based upon ***concerns that Todd [Cruse], Mark [Sniegocki] and Bob [Lynn] shared about the State's position on large groups, Snodgrass and others that we need to "keep out" of the network***. I'll be scheduling a meeting to discuss in the next week or two (as schedules permit) to look at TN and decide next steps for our strategy.

(Docket Entry 145-4, p. 17, 22) (emphasis added). When confronted with this email, Cheryl Polmatier stated that Todd Cruse, Mark Sniegocki, and Bob Lynn were only sharing the State's positions regarding large groups, not about specific providers who should be kept out of the

network. (Docket Entry 145-4, p. 17). Cheryl Polmatier claimed that keeping Dr. Snodgrass out of the network was Barry Major's and her own strategy, and Todd Cruse stated that he knew the State disliked large groups based on his prior experiences. (Docket Entry 145-4, p. 17-18) (Docket Entry 181-3, p. 3). The ambiguous text of the email is subject to several reasonable interpretations. Cheryl Polmatier's and Todd Cruse's testimony regarding the email may be correct. Alternatively, the message could be read to mean that the State had shared its position on large groups as well as the State's desire to not invite Snodgrass-King and others into any future dental provider network. Emphasis is placed on the parentheticals Cheryl Polmatier placed around "keep out," which suggests that it was not her idea to keep out a group of providers. Reasonable minds could draw several different meanings out of this email.

Cheryl Polmatier was also questioned regarding a December 27, 2012 through January 17, 2013, email thread between herself, Mark Sniegocki, Bob Lynn, Barry Major, Todd Cruse, Michele Blackwell, Ellen Rattey, Amy Nelson, and Tracie Milso. (Docket Entry 145-4, p. 18-19, 23-25). The email discusses DentaQuest's preparations in anticipation of the TennCare RFP. Cheryl Polmatier writes:

> **It's my understanding from previous conversations that there are certain providers and large provider groups that Tenncare would prefer that we not have in our network. Does someone have a listing of these providers or offices?**
>
> From there we can determine what our position will be, what communication we need to draft in prep for the RFP. ***Let me know who knows which offices (besides Snodgrass)***, and from there we can reach out to Ron Price[8] and understand the position we need to take in communication regarding our network build for Tenncare.

(Docket Entry 145-4, p. 25) (emphasis in original and emphasis added). Michele Blackwell responded that no specific providers were currently known but would likely be identified once

---

[8] DentaQuest's in-house counsel

TennCare had awarded the contract. (Docket Entry 145-4, p. 24). According to Cheryl Polmatier, TennCare had expressed to the DentaQuest sales team that it was concerned with the participation of large group practices. (Docket Entry 145-4, p. 19). This explanation is compatible with one reading of the email — that Snodgrass-King was one of the "large provider groups that Tenncare [sic] would prefer that we not have in our network." (emphasis removed). However, this email could also be reasonably construed as meaning that Snodgrass-King was one of the "certain providers . . . that Tenncare would prefer that we not have in our networks." (emphasis removed). As with the first email discussed, a rational trier of fact could also infer from this message that the State was pressuring DentaQuest to exclude Snodgrass-King from any prospective provider network.

Snodgrass-King also references two other email exchanges dated January 8, 2013, from Cheryl Polmatier to Bob Lynn, Mark Sniegocki, and Ron Price. (Docket Entry 145-1). The first email states:

> If we wanted to amend any CoverKids provider, **with the exception of Snodgrass** (33 providers), we'd be amending approximately 720 unique providers to participate in Tenncare. Our original network for Tenncare back then was approximately 900 unique providers.
>
> If we know who we want to invite, I think we could start to amend [. . .] but it will create noise for anyone we don't invite who wants in. But if we're going to amend the entire CK network, **everyone but Snodgrass**, I think it wouldn't hurt to start now. **But I need Mark or Michele to let us know if that will have any impact on the RFP**, as I don't have the history with the network to gauge their reaction.

(Docket Entry 145-1, p. 3) (emphasis added). The second email states:

> **As Mark [Sniegocki] and I chat further, we don't know who the other providers are specifically that the State is not interested in.** What we do know is that they are not fans of the mobile units, large group practices. That said we do need to be somewhat selective. . . .

If we want to take our time with this approach, then we should not send out any amendments today, and ***await the analysis and any further information from the state/Gilcrest[9] [sic] on who they don't want to work with.***

(Docket Entry 145-1, p. 1-2) (emphasis added). These emails may also be interpreted to support Snodgrass-King's claim that the State influenced DentaQuest's provider selection. In the first email, Cheryl Polmatier suggests that the decision to amend the CoverKids network without Snodgrass-King is dependent on the RFP and possibly the State's reaction to the amendments. Alternatively, reading the email in DentaQuest's favor, this email could be discussing purely internal network decisions. Reading the second email in the light most favorable to Snodgrass-King, it is entirely reasonable that a trier of fact could infer that the State had provided information to DentaQuest about which providers the State did not want to work with. Cheryl Polmatier states that she and Mark Sniegocki do not know which "other providers" the State is not interested in. This suggests the State has already conveyed its disinterest in at least one provider. Cheryl Polmatier further advises that they wait for "any further information" from the State concerning who the State does not want to work with. This wording suggests that the State has already provided information to DentaQuest employees. In opposition to these interpretations, DentaQuest offers the deposition testimony of James Gillcrist who stated that he "did not discuss or raise Dr. Snodgrass or Snodgrass-King Pediatric Dental Associates, P.C. with anyone at DentaQuest USA in relation to the development of their dental provider network for the TennCare-DentaQuest Contract." (Docket Entry 124 ¶ 18). James Gillcrist also stated that "TennCare did not, and had no authority to, participate in DentaQuest USA's decision about developing the dental provider network under the 2013 Contract." (Docket Entry 124 ¶ 17). DentaQuest also argues that this email should be read in the context of Michele Blackwell's email from a separate thread, where Michele Blackwell stated:

---

[9] Dr. Gillcrist is the Dental Director for the Bureau of TennCare. (Docket Entry 124 ¶ 1).

> I do not believe any of us know specific providers to date [that TennCare would like to keep out of the network]. However, what will more than likely happen is once TennCare chooses its dental vendor they will provide a list of provider offices which have significant UR [utilization review] Issues and ask the vendor take this into account when finalizing its network.

(Docket Entry 145-4, p. 24). According to DentaQuest, the "further information" is the post-contract list of offices referred to by Michele Blackwell. Each party has proffered a reasonable interpretation of the emails. However, for purposes of this motion, the Court must look at the evidence in the light most favorable to Snodgrass-King. A rational trier of fact could resolve this ambiguity in Snodgrass-King's favor.

Overall, reading these emails in the light most favorable to Snodgrass-King, a rational trier of fact could fall on either side of the issue of whether the State coerced or significantly encouraged DentaQuest's provider selection. As indicated with respect to each email thread submitted by Snodgrass-King, reasonable minds could differ as to the emails' meaning. Contrary to what DentaQuest contends, Snodgrass-King's arguments are supported with more than just conjecture. A plain reading of these emails corroborates Snodgrass-King's theory of state action. Accordingly, the extent of state action in DentaQuest's provider selection is in genuine dispute and should be submitted to a jury. DentaQuest's request for summary judgment on this issue should be **DENIED**.[10]

## B. Fourteenth Amendment Equal Protection[11]

Snodgrass-King contends that DentaQuest's large provider rule, wherein dental providers with three or more locations were excluded from initial consideration in DentaQuest's provider

---

[10] As there is a basis for finding state action, the Magistrate Judge refrains from commenting on the merits of the symbiotic relationship or nexus test as applied to these facts.

[11] Senior District Judge Haynes previously dismissed Snodgrass-King's "class-of-one" equal protection claim, leaving only Snodgrass-King's claim that the large provider policy does not rationally serve a legitimate government purpose. (Docket Entry 71).

selection, discriminates between large providers and small providers without a rational relationship to any legitimate government purpose. (Docket Entry 61 ¶ 77-79).

No State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. As is recognized by the parties, Snodgrass-King's equal protection claim is subject to rational basis review since it does not implicate a fundamental right or a suspect or quasi-suspect classification. *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015) (citing *Romer v. Evans*, 517 U.S. 620, 631 (1996)). Under rational basis review, "the burden is on the challenger to show that the government's action is not rationally related to any legitimate public interest." *Id.* (citing *Heller v. Doe by Doe*, 509 U.S. 312, 319-20 (1993)). This may be accomplished in two ways: "by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006)). "The State, conversely, bears no burden of proof; its legislative choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir. 2006), *overruled on other grounds as recognized by Davis*, 679 F.3d at 442).

DentaQuest argues that the equal protection claim should be dismissed for the following reasons: (1) large providers other than Snodgrass-King were invited into the network and (2) the large provider rule survives rational basis review because large providers are administratively difficult to manage and more costly to credential. (Docket Entry 121, p. 15). Snodgrass-King, on the other hand, contends that the actual reason for being excluded from the network is still in

genuine dispute. (Docket Entry 143, p. 31-34). According to Snodgrass-King, it is the acrimonious relationship between Dr. Snodgrass and the DentaQuest corporate family, not the large provider rule, which kept Dr. Snodgrass out of the provider network. (Docket Entry 143, p. 33-34).

DentaQuest's reason for excluding Snodgrass-King from the provider network is a material fact to this equal protection claim and is genuinely disputed. DentaQuest may be correct that the large provider rule was the impetus for not inviting Snodgrass-King into the network. On the other hand, a rational trier of fact could also agree with Snodgrass-King's "animus or ill-will" theory, finding that Dr. Snodgrass' constitutionally protected speech motivated the exclusion and that the large provider rule is merely a cover.

 For example, one of DentaQuest's network goals in January 2013 was to "Keep Dr. Snodgrass out of the network." (Docket Entry 145-6, p. 60, 64).[12] Cheryl Polmatier's and Barry Major's[13] testimony confirm this. (Docket Entry 145-4, p. 18) (Docket Entry 145-9, p. 18-19). This goal was developed before the RFP and its multiple location provider provision were even released. Later, in a February 5, 2013 email discussing the RFP, Cheryl Polmatier referred to Dr. Snodgrass as a litigious "problem provider" who had previously sued DentaQuest to participate with TennCare and Coverkids. (Docket Entry 145-6, p. 65). In May 2013, Cheryl Polmatier discussed a method for selecting providers, noting that under the strategy:

> ***The only problem is that we'd have to figure out a way to justify excluding Snodgrass due to the fact that he would be allowed to stay in the network using this criteria.*** We could lower the criteria to 40% but then we'd lose some other providers. We can take a look at what the geo access would be at 40% to determine if that's the way to go. ***If not, we may need to get a little more creative.***

---

[12] Although DentaQuest argues that this was only part of the draft plan, it is still very relevant to this issue. (Docket Entry 145-6 ¶ 124).

[13] In February 2013, and probably even earlier, Cheryl Polmatier and Barry Major were aware of Dr. Snodgrass' previous litigation against DentaQuest. (Docket Entry 145-6, p. 65).

(Docket Entry 145-9, p. 32) (emphasis added). This email alone casts doubt on legitimacy of the eventual justification for excluding Snodgrass-King from the provider network, the large provider rule. Although DentaQuest employees had earlier discussed a preference against large providers, it was not until July or August 2013 that Cheryl Polmatier and Barry Major actually developed the large provider rule. (Docket Entry 145-9, p. 12-13). Even with this rule, Snodgrass-King was the only large practice group in Tennessee to be excluded from DentaQuest's provider group. (Docket Entry 145-9, p. 16-17). Upon review of these communications and their suggestions of animus and ill-will towards Snodgrass-King, the Court is of the opinion that DentaQuest's actual reason for excluding Snodgrass-King from the provider network is in genuine dispute. DentaQuest's motion for summary judgment on the equal protection claim should be **DENIED**.

## C. First Amendment Retaliation

Snodgrass-King claims that DentaQuest excluded it from the TennCare dental provider network in retaliation for Dr. Snodgrass' prior public criticism of DentaQuest's corporate affiliates' administration of TennCare and Dr. Snodgrass' prior lawsuits against DentaQuest corporate affiliates. (Docket Entry 61 ¶ 88-92).

First Amendment retaliation claims are subject to a burden-shifting framework. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). To make a prima facie case of retaliation, the plaintiff must establish the following three elements: "(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 645 (6th Cir. 2015) (quoting *Fritz v. Charter Twp. of*

*Comstock*, 592 F.3d 718, 723 (6th Cir. 2010)); *see also Dye*, 702 F.3d at 294. A retaliatory motive may be inferred from circumstantial evidence, such as "the timing of events or the disparate treatment of similar individuals." *Paterek*, 801 F.3d at 647 (quoting *Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002)). If the plaintiff establishes all three elements, the defendant bears the burden of proving it would have acted in the same way regardless of the protected activity. *Dye*, 702 F.3d at, 294-95; *Arnett*, 281 F.3d at 561. "Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citation omitted).

DentaQuest's push for summary judgment focuses on the third element: causation. DentaQuest argues that summary judgment is warranted because there is no causal connection between Snodgrass-King's constitutionally protected conduct and DentaQuest's decision to not invite Snodgrass-King into the provider network. (Docket Entry 121, p. 18). In response, Snodgrass-King contends that the individuals aware of Dr. Snodgrass' constitutionally protected speech are responsible for keeping Snodgrass-King out of the network and that his First Amendment speech is the reason for his exclusion. (Docket Entry 143, p. 20).

Viewing the evidence in the record in the light most favorable to Snodgrass-King, a rational trier of fact could conclude that Snodgrass-King's exclusion from the DentaQuest provider network was motivated, at least in part, by Snodgrass-King's constitutionally protected conduct. As Senior District Judge Haynes previously held, Snodgrass-King's two lawsuits against DentaQuest's corporate affiliates and public criticism of DentaQuest's corporate affiliates are constitutionally protected conduct. (Docket Entry 71-1, p. 14) (citing *Bounds v. Smith*, 430 U.S. 817, 821 (1977) (constitutional right of access to the courts) and *Waters v.*

*Churchill*, 511 U.S. 661, 668 (1994) (First Amendment protected speech). The evidence supporting the equal protection analysis applies to this claim to the same effect: Cheryl Polmatier's reference to Dr. Snodgrass as a "problem provider" with a history of lawsuits against DentaQuest to participate with TennCare and CoverKids (Docket Entry 145-6, p. 65), Cheryl Polmatier's comment that under a proposed provider selection process, "we'd have to figure out a way to justify excluding Snodgrass due to the fact that he would be allowed to stay in the network using this criteria" (Docket Entry 145-9, p. 32), and the fact that Snodgrass-King is the only large provider who was ultimately excluded from the network based on the large provider rule (Docket Entry 145-9, p. 16-17). This evidence suggests that Snodgrass-King's exclusion from the DentaQuest network, the adverse action for purposes of the First Amendment retaliation claim, may be based on animus or ill-will arising from Dr. Snodgrass' lawsuits against and criticism of DentaQuest's corporate affiliates. Despite the amount of time that has elapsed between the First Amendment protected conduct and the fairly recent decision to not invite Snodgrass-King into the network, a rational trier of fact could find in Snodgrass-King's favor on this claim. DentaQuest's motion for summary judgment on this claim should be **DENIED**.

## D. Fourteenth Amendment Procedural Due Process

Under the Fourteenth Amendment, States may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. From this text, courts have inferred both substantive and procedural due process rights. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 546 (6th Cir. 2012). Snodgrass-King has alleged a procedural due process violation. (Docket Entry 61 ¶ 93-99).

In order to succeed on a procedural due process claim, the plaintiff must establish: "(1) the existence of a protected property interest at issue, (2) a deprivation of that protected property

interest, and (3) that he or she was not afforded adequate procedures." *Paterek*, 801 F.3d at 649

(citing *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014)). With respect to the

first requirement:

> Property interests are not created by the Constitution, instead they are created and
> defined by independent sources such as state law. [*Bd. of Regents of State
> Colleges v. Roth*, 408 U.S. 564, 577 (1972)]. "To have a property interest in a
> benefit, a person clearly must have more than an abstract need or desire for it. He
> must have more than a unilateral expectation of it. He must instead have a
> legitimate claim of entitlement to it." *Id.* "[A] benefit is not a protected
> entitlement if government officials may grant or deny it in their discretion."
> [*Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005)].

*Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 632 (6th Cir. 2013). "[I]n order to assert a

property interest . . . [the plaintiff] must point to some policy, law, or mutually explicit

understanding that both confers the benefit and limits the discretion of the [state] to rescind the

benefit." *Med Corp. v. City of Lima*, 296 F.3d 404, 410 (6th Cir. 2002).

Considering this issue, the Magistrate Judge reviewed the cases predominantly cited by

the parties. The first case involved the procedural due process requirements for revoking a liquor

license. *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710 (6th Cir. 1991), *superseded by statute*, Ohio

Rev. Code §§ 4301.35 and 4305.14, *as stated in 37712, Inc. v. Ohio Dep't of Liquor Control*,

113 F.3d 614 (6th Cir. 1997). The Sixth Circuit held that "a holder of an Ohio liquor license has

a property interest protected under the Due Process Clause." *Id.* at 716. This was supported by

the court's finding that the license could be transferred, sold, inherited, and renewed, and the

holder had a statutory right to a hearing and appeal before the license could be revoked. *Id.* at

714. The court reasoned that "[w]hile the Ohio revocation provision does not state that a license

can be revoked only for cause, the notice, hearing, and appeal provisions would be pointless

unless the legislature intended there to be some reason for revocation." *Id.* at 715. This case is

contrasted with *Latimer v. Robinson*, No. 04-5828, 2005 WL 1513103 (6th Cir. June 21, 2005).

*Latimer* involved a challenge to a rule promulgated by the Bureau of TennCare which limited the ability of general dentists to be reimbursed for orthodontic services under the TennCare program. *Id.* at *1. The plaintiffs argued that the new rule had "deprive[d] them of their property interest in their dentistry licenses." *Id.* As the Sixth Circuit explained, "[a] license to perform dental services . . . does not translate into an entitlement to receive a particular business opportunity from the TennCare program . . . ." *Id.* The Sixth Circuit further found that "although the TennCare program has promulgated eligibility criteria for provider-participants who seek reimbursement for Medicaid services . . . , the eligibility criteria alone are insufficient to create a property interest in the receipt of reimbursements." *Id.* at *2. The procedural due process claim failed because the plaintiffs had not identified any policies or regulations that "limit[ed] TennCare's discretion to adopt [the] policy . . . ." *Id.*

Snodgrass-King argues that Tenn. Code Ann. § 71-5-118, "Provider contracts; actions against provider; fraud," provides a constitutionally protected property interest for dental providers enrolled in the TennCare network to remain in the TennCare network. (Docket Entry 61 ¶ 96). Section 71-5-118(a) provides that:

> (a) The ***commissioner of finance and administration*** has the authority to ***enter into contracts*** with qualified vendors to provide to eligible recipients medical assistance allowed under § 71-5-107. The commissioner has the authority to ***terminate or suspend existing contracts*** with providers, to ***refuse to enter into contracts*** with providers, and to ***recover any payments*** incorrectly paid ***if the commissioner finds that such actions will further the purpose of this section. Any action against such provider shall be treated as a contested case in accordance with the Uniform Administrative Procedures Act***, compiled in title 4, chapter 5. If a hearing is requested by the provider, it shall be held prior to the imposition of any of the sanctions of this subsection (a), except that upon a finding by the commissioner that the public health, safety, or welfare imperatively requires emergency action, these ***sanctions*** may be imposed pending an opportunity for the provider to request a prompt hearing. Furthermore, the commissioner has the right to set off any money incorrectly paid against any claim for money submitted by the provider pending an

opportunity for a hearing. Grounds for action against providers under this subsection (a) include, but are not limited to, the following:

> (1) Violation of the terms of the contract;
>
> (2) Violation of any provision of this part or the rules promulgated pursuant to this part;
>
> (3) Billing for medical assistance that was not delivered;
>
> (4) Provision of medical assistance that is not medically necessary or justified;
>
> (5) Provision of medical assistance of a quality that is below professionally recognized standards;
>
> (6) Revocation or suspension of a provider's professional license or other disciplinary action by the agency regulating the profession of the provider; and
>
> (7) Failure to produce records, upon request, by authorized representatives of the commissioner as necessary to substantiate the medical assistance for which claims have been submitted.

(emphasis added). In denying DentaQuest's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) (Docket Entry 24), this Court concluded that Snodgrass-King's invocation of § 71-5-118 satisfied its duty to plead a protected property interest. (Docket Entry 71, p. 25). The Court stated:

> Plaintiffs contend that [Tenn. Code Ann. § 71-5-118] satisfies their burden to "point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of [the defendant] to rescind the benefit." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 410 (6th Cir. 2002). Plaintiffs assert that the TDFA Commissioner's discretion to take action against providers is expressly limited to furthering the interests of TennCare. *See Brook Park Entertainment, Inc. v. Taft*, 951 F.2d 710, 715 (6th Cir. 1991) (noting that "[w]hile the Ohio revocation provision does not state that a license can only be revoked for cause, the notice, hearing, and appeal provisions would be pointless unless the legislature intended there to be some reason for revocation.").
>
> In addition to that language, the Court views the . . . language in Tenn. Code Ann. § 71-5-118(a), requiring notice and an opportunity to be heard prior to loss of participation in the TennCare network, as comparable to the limiting provisions in

> *Brook Park Entertainment.* **For these reasons, the Court concludes that**
> **Plaintiffs have sufficiently pled a protected property interest.** *Med Corp*, 296
> F.3d at 410.
>
> DentaQuest USA contends that Tenn. Code Ann. § 71-5-118 is solely a sanctions
> provision and that it does not create any property right to be considered as a
> provider of medical services to TennCare recipients. DentaQuest USA cites
> *Latimer v. Robinson*, where the Sixth Circuit upheld the dismissal of a procedural
> due process claim of general dentists who would no longer be reimbursed for
> orthodontic services to Tennessee's Medicaid enrollees, absent extenuating
> circumstances, after TennCare changed its policy. No. 04-5828, 2005 WL
> 1513103 (6th Cir. June 21, 2005). As the Sixth Circuit stated in *Latimer*, "the lack
> of a cognizable property interest is exemplified by Plaintiffs' concession that the
> TennCare program has the legal right to completely exclude all dentists from the
> program." *Id.* at *2. Yet, the Sixth Circuit also explained that those plaintiffs had
> failed to identify any "regulation or policy . . . that limits TennCare's discretion to
> adopt a policy that denies reimbursement to general dentists for orthodontic
> services they provide to TennCare enrollees." *Id.* For the reasons stated earlier,
> the Court deems the underscored language of Tenn. Code Ann. § 71-5-118(a),
> requiring notice and an opportunity to be heard **prior** to loss of participation in
> the TennCare network, as comparable to the limiting provisions in *Brook Park*
> *Entertainment* and, therefore, distinguishable from *Latimer*.

(Docket Entry 71-1, p. 25-26) (emphasis added).

Although the invocation of the statute satisfied Snodgrass-King's burden at the pleading

stage, it does not survive DentaQuest's motion for summary judgment for the following reasons.

First, the statute specifically applies to sanctions imposed by the commissioner of finance and

administration, not DBMs. Second, the statute is inapplicable to these facts because

DentaQuest's decision to not include Snodgrass-King in its provider network was not a

"sanction."

To begin, § 71-5-118(a) only authorizes the commissioner of finance and administration

to impose sanctions on TennCare providers. As emphasized by the State in its *amicus* brief,

federal courts interpreting undecided matters of state law should model their statutory

interpretation approach on the methods preferred by the state's highest court. *In re Darvocet,*

*Darvon, & Propoxyphene Products Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014). When

presented with an unambiguous statute, the Tennessee Supreme Court applies the statute's plain meaning. *Womack v. Corr. Corp. of Am.*, 448 S.W.3d 362, 366 (Tenn. 2014). Otherwise, when presented with unclear or ambiguous statutory language, the Tennessee Supreme Court may consider "the broader statutory scheme, the history and purpose of the legislation, public policy, historical facts preceding or contemporaneous with the enactment of the statute, earlier versions of the statute, the caption of the act, and the legislative history of the statute—to discern the legislature's intent." *Id.*

The text of § 71-5-118 is unambiguous. It explicitly grants authority to the commissioner of finance and administration and makes no mention of a DBM or a managed care contractor ("MCC"). These entity identities are not interchangeable. For example, the immediately preceding section, § 71-5-117, separately references the commissioner of finance and administration, the Bureau of TennCare director, and individual managed care organizations ("MCOs"). Tenn. Code Ann. § 71-5-117(c). This plain reading of the unambiguous statute is further supported by regulations promulgated by the Bureau of TennCare. Emphasizing the commissioner's authority under the statute, a regulation titled "Provider Sanctions" begins with the following: "Pursuant to the authority granted by T.C.A. § 71-5-118 to the Commissioner[14] to impose sanctions against providers, the Commissioner, through the Bureau, may take the following actions against a provider . . . ." Tenn. Comp. R. & Regs. 1200-13-18-.08(1). Taking such actions under § 71-5-118 requires a hearing if requested. In contrast, another regulation provides that "[a] provider of services may not appeal . . . [a]n MCC's refusal to contract with the provider." Tenn. Comp. R. & Regs. 1200-13-18-.01(2)(a).[15] On one hand, a provider may

---

[14] The regulations further define "Commissioner" as "[t]he chief administrative officer of the Tennessee Department where the Bureau is administratively located." Tenn. Comp. R. & Regs. 1200-13-18-.02(8).

[15] Snodgrass-King believes that this regulation is wrong or inapplicable for two reasons. (Docket Entry 199, p. 12). Since Snodgrass-King is under the impression that the commissioner has delegated his authority under § 71-5-118 to

request a hearing if the commissioner refuses to enter into the contract with the provider as a sanction; on the other hand, a provider may not appeal a DBM's refusal to contract with the provider. Here, we are presented with the second option: a DBM declined to invite Snodgrass-King into the provider network. This approach complies with the court's obligation to "construe a statute in a reasonable manner 'which avoids statutory conflict and provides for harmonious operation of the laws.'" *Womack*, 448 S.W.3d at 366 (quoting *Baker v. State*, 417 S.W.3d 428, 433 (Tenn. 2013)). For this reason, § 71-5-118 is inapplicable to DentaQuest's provider selection.

Additionally, even if DentaQuest's actions could be construed as actions taken by the commissioner, § 71-5-118 and any property interest created by the section do not apply to this fact pattern. This is because the plain language of the section does not support a finding that declining to invite Snodgrass-King into the DentaQuest provider network was a "sanction." The statute only guarantees due process hearing rights to providers who are sanctioned by the commissioner. Declining to invite a provider into a new provider network is not necessarily a sanction. The statute gives several examples of sanctionable conduct, including improper billing and failing to comply with contractual terms. Tenn. Code Ann. § 71-5-118(a)(1)-(7). The crux of the issue seems to turn on the reason for excluding the provider. None of the purported reasons for DentaQuest's decision not to invite Snodgrass-King into the network, however, resemble the for-cause type of sanctionable conduct described in the statute.

Although § 71-5-118 may confer due process hearing rights to providers who are sanctioned by the commissioner, DentaQuest's decision to not invite Snodgrass-King into the

---

the DBMs, Snodgrass-King believes that the hearing requirements also apply to DMBs, so the regulation is incorrect. Second, Snodgrass-King believes its property interest accrued in 2009 (when it obtained the right to treat TennCare patients) and that the regulation does not apply to Snodgrass-King because the regulation was promulgated in 2011. (Docket Entry 171, p. 12-13).

provider network was not a sanction and was not imposed by the commissioner. Snodgrass-King's complaint did not identify an alternative policy or regulation that limits DBM discretion in creating provider networks. Seeing as Snodgrass-King did not have a protected property interest in continuing to provide TennCare services, DentaQuest's motion for summary judgment on the procedural due process claim should be **GRANTED** and Snodgrass-King's motion for partial summary judgment on the claim should be **DENIED**. [16]

### E. Medicaid Claim, 42 U.S.C. § 1396u-2

Snodgrass-King claims that DentaQuest's decision to not include Snodgrass-King in the provider network violated Snodgrass-King's rights under 42 U.S.C. § 1396u-2(b)(7), a provision of federal Medicaid law titled "Antidiscrimination." (Docket Entry 61 ¶ 103-107). This section provides:

> A medicaid managed care organization shall not discriminate with respect to participation . . . as to any provider who is acting within the scope of the provider's license or certification under applicable State law, *solely on the basis of such license or certification*. This paragraph shall not be construed to prohibit an organization from including providers only to the extent necessary to meet the needs of the organization's enrollees or from establishing any measure designed to maintain quality and control costs consistent with the responsibilities of the organization.

42 U.S.C. § 1396u-2(b)(7) (emphasis added) . This antidiscrimination section is implemented by several regulations. First, 42 C.F.R. § 438.214(c) states:

> Nondiscrimination. MCO, PIHP, and PAHP provider selection policies and procedures, *consistent with § 438.12*, must *not discriminate against particular providers that serve high-risk populations or specialize in conditions that require costly treatment*.

(emphasis added). The section referenced, 42 C.F.R. § 438.12, provides:

---

[16] The Magistrate Judge notes that proposed amendments to Tennessee Code Annotated, Title 71, Chapter 5, Part 1 suggest that Tennessee's current system may be changed to a limited "any willing provider" system in the near future. S.B. 1175, 109th Gen. Assemb., 2015 Sess. (Tn. 2015); H.B. 56, 109th Gen. Assemb., 2015 Sess. (Tn. 2015). If that turns out to be the case, the property interest analysis may come out differently.

(a) General rules.

    (1) An MCO, PIHP, or PAHP may not discriminate for the participation . . . of any provider who is acting within the scope of his or her license or certification under applicable State law, solely on the basis of that license or certification. If an MCO, PIHP, or PAHP declines to include individual or groups of providers in its network, it must give the affected providers written notice of the reason for its decision.

    (2) In all contracts with health care professionals, an MCO, PIHP, or PAHP must comply with the requirements specified in § 438.214.

(b) Construction. *Paragraph (a) of this section may not be construed to—*

    (1) *Require the MCO, PIHP, or PAHP to contract with providers beyond the number necessary to meet the needs of its enrollees*;

    (2) Preclude the MCO, PIHP, or PAHP from using different reimbursement amounts for different specialties or for different practitioners in the same specialty; or

    (3) *Preclude the MCO, PIHP, or PAHP from establishing measures that are designed to maintain quality of services and control costs and are consistent with its responsibilities to enrollees.*

42 C.F.R. § 438.12 (emphasis added).

According to Snodgrass-King, DentaQuest violated § 1396u-2(b)(7) "by instituting and enforcing selection policies and procedures that discriminated against Plaintiffs on the sole basis that Plaintiffs were acting within their license or certification as dentists serving high-risk populations and/or specializing in conditions that require costly treatment." (Docket Entry 61 ¶ 107). Although this allegation survived DentaQuest's motion to dismiss, it is held up to a higher standard at the summary judgment stage.

DentaQuest requests summary judgment for two reasons. First, DentaQuest argues that the nondiscrimination provision does not require MCOs to include more providers than are needed and allows MCOs to implement cost-control measures. (Docket Entry 121, p. 22). Second, DentaQuest argues that Snodgrass-King has not developed any evidence to establish

discrimination on the basis of Snodgrass-King's patients and their dental costs. (Docket Entry 121, p. 22). According to DentaQuest, "all or nearly all TennCare dental providers serve high-risk populations or patients with costly treatments." (Docket Entry 121, p. 22). Further, DentaQuest argues that Snodgrass-King has not developed any evidence establishing that its exclusion from the network was motivated by its clientele and their expenses. (Docket Entry 121, p. 23).

Snodgrass-King has not responded to DentaQuest's motion for summary judgment on this claim. Pursuant to Local Rule 7.01(b), Snodgrass-King's failure to respond "shall indicate that there is no opposition to the motion." Even looking at the merits of the claim, no evidence has been cited in support of the claim that Snodgrass-King was discriminated against because of its clientele or the cost of the clientele's procedures. DentaQuest's motion for summary judgment on this claim should be **GRANTED**.

### F. Compensatory Damages for the Optional Renewal Periods

Among other forms of relief, Snodgrass-King seeks compensatory damages. (Docket Entry 61, p. 23). DentaQuest requests the Court to bar Snodgrass-King from seeking damages for the two one-year optional contract renewal periods provided for in the DentaQuest TennCare contract. (Docket Entry 121, p. 21-23). According to DentaQuest, these damages are too speculative. (Docket Entry 121, p. 21-23). Snodgrass-King believes that there is sufficient evidence to suggest that the State may exercise its contract renewal options and therefore the information should be submitted to a jury. (Docket Entry 143, p. 34-37).

Although § 1983 creates a cause of action, it does not contain a provision regarding damages. In instances like this, where federal statutes are "deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and

changed by the constitution and statutes of the State wherein the court having jurisdiction of such

civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and

laws of the United States, shall be extended to and govern the said courts in the trial and

disposition of the cause . . . ." 42 U.S.C. § 1988(a). As this action was filed in Tennessee, the

common law of Tennessee is applied. *See* 42 U.S.C. § 1988(a); *Frontier Ins. Co. v. Blaty*, 454

F.3d 590, 598 (6th Cir. 2006). Tennessee's approach to compensatory damages is as follows:

> Damages may never be based on speculation or conjecture. *Overstreet v.
> Shoney's, Inc.*, 4 S.W.3d [694,] 703 [(Tenn. Ct. App. 1999)]; *Western Sizzlin, Inc.
> v. Harris*, 741 S.W.2d 334, 335-36 (Tenn. Ct. App. 1987). However, damages
> become too speculative only when the existence of damages is uncertain, not
> when the precise amount is uncertain. *Church v. Perales*, 39 S.W.3d 149, 172
> (Tenn. Ct. App. 2000). The evidence required to support a claim for damages
> need only prove the amount of damages with reasonable certainty. *Wright Med.
> Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 595 (Tenn. Ct. App. 2001); *Overstreet v.
> Shoney's, Inc.*, 4 S.W.3d at 703.

*Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 57-58 (Tenn. Ct. App.

2004).

DentaQuest argues that this case presents a factual scenario akin to that in *B & L Corp. v.

Thomas & Thorngren, Inc.*, 162 S.W.3d 189 (Tenn. Ct. App. 2004). In *B & L Corp.*, the lower

court awarded the plaintiff compensatory damages for the defendant's intentional inducement of

a breach of contract. *Id.* at 221. The contract at issue was renewed on a yearly basis. *Id.* The

lower court assessed damages for three years. *Id.* Finding that there was no evidence to support a

finding that the contract would have been renewed for two of those years, the Tennessee Court of

Appeals limited the compensatory damages to a one-year period. *Id.* Snodgrass-King argues that

this case is factually distinct from *B & L Corp.* because there is enough evidence to conclude that

the State would renew its contract with DentaQuest. Snodgrass-King first cites *Pinson &

Associates Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn. Ct. App. 1990) in which the

Tennessee Court of Appeals affirmed the lower court's award of future commissions that would

be accrued if insurance policy holders renewed their policies. This was supported by the court's finding that ninety percent of the insurance policies were renewed annually. *Id.*

Viewing the evidence in the light most favorable to Snodgrass-King, a rational trier of fact could conclude that the State will exercise its prerogative to extend the DentaQuest contract for two additional years. From 2002 to 2010, corporate affiliates of DentaQuest, Doral and DentaQuest of TN, administered TennCare. (Docket Entry 145-11, p. 3) (Docket Entry 145-12, p. 2). During that time, the State opted to renew the contract with the corporate affiliates several times. (Docket Entry 145-11, p. 3) (Docket Entry 145-12, p. 3). Steven Pollack agreed with Snodgrass-Kings's attorney's statement that "in terms of DentaQuest's track record with renewal at – with the State of Tennessee, [DentaQuest has] a pretty good track record from the past of getting renewals on the contracts – on its contracts . . . ." (Docket Entry 145-12, p. 3). The renewals ended, of course, when Delta Dental was selected to administer TennCare from 2010 to 2013. (Docket Entry 124-4). Delta Dental's contract was not extended, in part, because the State wished to reformat the TennCare contract to include the risk-share provision found in DentaQuest's contract. (Docket Entry 124 ¶ 24). Immediately after the contract with Delta Dental expired in 2013, DentaQuest was selected to administer TennCare from 2013 to 2016 with a possibility to two one-year renewals. From 2013 to 2014, DentaQuest achieved its goals and received the maximum risk-share compensation from the State, eight million dollars. (Docket Entry 145-11, p. 2). In May 2015, DentaQuest was "trending towards" satisfying the State's risk-share requirements for 2014-2015. (Docket Entry 145-11, p. 2-3). In the spring or summer of 2014, TennCare officials "expressed that they were pleased with the direction of the program" under DentaQuest's administration. (Docket Entry 145-11, p. 4).

Unlike *B & L Corp.*, Snodgrass-King has submitted evidence suggesting that the contract will likely be renewed for up to two years. The Magistrate Judge recognizes that the renewal decision ultimately lies with the State, but based on DentaQuest's corporate affiliates' lengthy history administering TennCare and DentaQuest's current performance reviews, the likelihood that the contract will be extended is not so speculative that it should be withheld from the jury. DentaQuest's motion to exclude compensatory damages for the contract renewal periods should be **DENIED**.

## G. Punitive Damages

In order to obtain an award of punitive damages for its § 1983 claims, Snodgrass-King must establish that DentaQuest's actions were "motivated by evil motive or intent, or . . . reckless or callous indifference to [Snodgrass-King's] federally protected rights . . . ." *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

DentaQuest requests that Snodgrass-King be barred from seeking punitive damages, asserting that Snodgrass-King has not established the requisite intent. (Docket Entry 121, p. 23). Snodgrass-King challenges this assertion, pointing at the evidence supporting its equal protection and First Amendment claims. (Docket Entry 143, p. 37-38).

A rational trier of fact could conclude that DentaQuest's decision to not invite Snodgrass-King into the DentaQuest provider network was based on animus or ill-will. The relevant facts are provided in the sections addressing Snodgrass-King's equal protection claim and First Amendment retaliation claim. DentaQuest argues that Snodgrass-King was not invited into the network due to DentaQuest's large provider rule. This might be the case, but the question of DentaQuest's intent is for a jury to decide. DentaQuest's motion to exclude Snodgrass-King's request for punitive damages should be **DENIED**.

## H. Injunctive Relief

In order to obtain a permanent injunction, the plaintiff must prove the following four elements:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L. C.*, 547 U.S. 388, 391 (2006)).

DentaQuest requests that Snodgrass-King be barred from seeking injunctive relief, specifically the claim that Snodgrass-King should be reinstated in the TennCare provider network. (Docket Entry 121, p. 24). According to DentaQuest, Snodgrass-King cannot meet the first two elements because Snodgrass-King has asserted a quantified claim for monetary damages. (Docket Entry 121, p. 24). Snodgrass-King did not respond to this challenge. Pursuant to Local Rule 7.01(b), Snodgrass-King's failure to respond "shall indicate that there is no opposition to the motion." DentaQuest's motion for summary judgment on Snodgrass-King's claim for reinstatement should be **GRANTED**.

## VI.    Conclusion

The Magistrate Judge **RECOMMENDS** the following: (1) Snodgrass-King's motion (Docket Entry 129) be **DENIED**; (2) DentaQuest's motion (Docket Entry 120) be **DENIED** as to the issue of state action, the equal protection and First Amendment retaliation claims, and the availability of compensatory and punitive damages; and (3) DentaQuest's motion (Docket Entry 120) be **GRANTED** as to the procedural due process and Medicaid (42 U.S.C. § 1396u-2) claims and to the request for injunctive relief.

Under Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days, after being served with a copy of this Report and Recommendation to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this report and recommendation within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this report and recommendation may constitute a waiver of further appeal. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 16th day of December, 2015

s/ Joe B. Brown_____
Joe B. Brown
U.S. Magistrate Judge