# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **SNODGRASS-KING PEDIATRIC** | ) | |
| **DENTAL ASSOCIATES, P.C. and** | ) | |
| **DAVID J. SNODGRASS, D.D.S.,** | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
|  | ) | |
| **v.** | ) | **NO. 3:14-cv-0654** |
|  | ) | **JUDGE CRENSHAW** |
| **DENTAQUEST USA INSURANCE CO.,** | ) | |
| **INC.,** | ) | |
|  | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

The parties have filed objections (Doc. Nos. 213, 214, 215 and 216) to the Magistrate Judge's Report and Recommendation ("R&R") (Doc. No. 211), that Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 129) be denied and that Defendant's Motion for Summary Judgment (Doc. No. 121) be granted in part and denied in part. The Court has reviewed *de novo* motions and the parties' objections and accepts the Magistrate Judge's R&R, except: the Court will also dismiss Plaintiffs' equal protection claim.

The Court has determined that the Magistrate Judge's statement of undisputed facts is supported in the record and accordingly is adopted.

## I. PROCEDURAL HISTORY

Plaintiffs initiated this action in March 2014 against DentaQuest, the Tennessee Department of Finance and Administration ("TDFA"), the Bureau of TennCare, and Larry B. Martin, TDFA Commissioner. In May 2014, pursuant to Plaintiffs' notice of voluntary dismissal (Doc. No. 38), the Court entered an order dismissing without prejudice all claims against TDFA,

the Bureau, and Larry Martin, leaving DentaQuest as the sole defendant. (Doc. No. 40.) In August 2015, the Magistrate Judge entered an order directing the Clerk to add the Attorney General for the State of Tennessee as an interested party and granting the State leave to file an *amicus curiae* brief "on any issue in which the State has an interest." (Doc. No. 117, at 1.)

Plaintiffs assert that Defendant is a state actor for purposes of 42 U.S.C. § 1983, that Defendant violated Plaintiffs' constitutional rights to equal protection, due process, and freedom of speech by excluding them from the TennCare dental provider network, and that Defendant's conduct violated federal Medicaid law, 42 U.S.C. § 1396u-2.[1] Plaintiffs seek punitive damages and compensatory damages for losses incurred during the initial three-year contract term, as well as for losses potentially incurred during two optional one-year extension terms.

On August 17, 2015, Defendant filed a Motion for Summary Judgment (Doc. No. 120), and Plaintiffs filed a Motion for Partial Summary Judgment (Doc. No. 129). Both motions have been fully briefed. The State of Tennessee filed a brief *amicus curiae* in support of Defendant's motion. Defendant seeks judgment in its favor as a matter of law on all of Plaintiff's claims because: its decision not to invite Plaintiffs to participate in the TennCare provider network did not constitute state action for purposes of a claim under 42 U.S.C. § 1983; even if there was state action, Plaintiffs failed to present sufficient evidence to establish that Defendant's conduct violated their equal protection and procedural due process rights; Defendant did not retaliate against Plaintiffs in violation of the First Amendment; and it did not violate Medicaid law, 42 U.S.C. § 1396u-2. Defendant also seeks summary judgment on Plaintiffs' requests for compensatory damages for the optional contract-extension periods, punitive damages, and

---

[1] In January 2015, Senior Judge William J. Haynes, Jr., to whom the case was previously assigned, entered an order dismissing part of the claim based upon the Equal Protection Clause of the Fourteenth Amendment and declining to exercise supplemental jurisdiction over Plaintiff's state-law claims (Doc. Nos. 71, 72.)

injunctive relief. Plaintiffs' motion seeks summary judgment only on its procedural due-process claim.

On December 16, 2015, the Magistrate Judge's R&R recommended: (1) Defendant's motion be denied on the state action, equal-protection, First Amendment claims, and the availability of compensatory and punitive damages; (2) Defendant's motion be granted on the procedural due process and Medicaid claims and the request for injunctive relief; and (3) Plaintiffs' motion on the procedural due process claim be denied. Both parties have filed timely motions objecting to the R&R and requesting that this Court make a de novo determination.

In April 2016, after the issuance of the R&R and the filing of the parties' objections, the matter was transferred to the undersigned.

## II.    STANDARD OF REVIEW

### A.    Objections to a Report and Recommendation

The district court must review de novo any portion of the magistrate judge's recommended disposition to which objections are properly lodged. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B) & (C). In conducting its review, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

### B.    Motions for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure allows a party to move for summary judgment in its favor with respect to entire claims or defenses or to parts of claims or defenses. Fed. R. Civ. P. 56(a). Pursuant to Rule 56, summary judgment must be entered in favor of a movant only if the "record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A), 56(a). To meet this burden, the moving party may rely upon the evidentiary materials identified in Rule 56(c)(1)(A) or may merely rely upon the failure of the opposing party to make a showing sufficient to establish the existence of one or more elements essential to that party's case and upon which that party will carry the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); United States v. Storey, 640 F.3d 739, 743 (6th Cir. 2011).

In reviewing the evidence, the Court must assume the truth of direct evidence provided by the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Additionally, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom and must draw "all justifiable inferences" in favor of the nonmovant. Id. at 249, 255. The Court must not grant summary judgment unless it finds the evidence "so one-sided that [the movant] must prevail as a matter of law." Id. at 252.

## III.    ANALYSIS

The issues presented by the parties' objections are: (1) whether Defendant is a state actor for purposes of 42 U.S.C. § 1983; (2) whether summary judgment is proper on Plaintiffs' equal-protection and First Amendment claims; (3) whether Defendant may be liable for compensatory damages; (4) whether punitive damages may be appropriate; and (5) whether Plaintiffs are entitled to summary judgment on the procedural due process claim.

### A.    State Action

In its Motion for Summary Judgment, Defendant argues, first, that it is entitled to judgment in its favor on all of Plaintiffs' § 1983 claims because Plaintiffs' exclusion from the provider network was not attributable to the State and that Defendant, a private corporation, did

not qualify as a state actor for purposes of § 1983. The Magistrate Judge concluded that there was a genuine dispute of material fact on whether Defendant was a state actor. In its objections, Defendant insists that the Magistrate Judge misconstrued the facts and drew unwarranted inferences in Plaintiffs' favor. The Court agrees with the Magistrate Judge.

### 1. The "Under Color of State Law" Element of § 1983 Claim

To be entitled to relief under 42 U.S.C. § 1983, a plaintiff must establish: (1) the deprivation of a right secured by the Constitution or laws of the United States and (2) that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)). A plaintiff may not proceed under § 1983 against a private party "no matter how discriminatory or wrongful" the private party's conduct. Sullivan, 526 U.S. at 50.

There are, however, circumstances under which a private person may become a "state actor" for § 1983 purpose. A "private party can fairly be said to be a state actor if: (1) the deprivation complained of was 'caused by the exercise of some right or privilege created by the State' and (2) the offending party 'acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.'" Tahfs v, Proctor, 316 F.3d 584, 590–91 (6th Cir. 2003) (quoting Lugar, 457 U.S. at 937).

The Sixth Circuit has recognized "as many as four tests to aid courts in determining whether challenged conduct is "fairly attributable" to the State: (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test." Marie v. Am. Red Cross, 771 F.3d 344, 362 (6th Cir. 2014), to wit:

> The public function test requires that the private entity exercise powers that are traditionally exclusively reserved to the State, such as holding elections, or

exercising the power of eminent domain. The state compulsion test requires that a State . . . exercise[] such coercive power or . . . provide[] such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the State responsible for those initiatives. Under the symbiotic relationship or nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. The entwinement test requires that the private entity be entwined with governmental policies or that the government be entwined in [the private entity's] management or control. The crucial inquiry under the entwinement test is whether the nominally private character of the private entity is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it.

A plaintiff need only show state action under one of the tests in order to proceed with her claim.

Wilcher v. City of Akron, 498 F.3d 516, 519 (6th Cir. 2007).

The Supreme Court has not expressly adopted or recognized these "tests" but has, instead, found that various fact patterns have established the existence of "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001). As the Supreme Court has recognized, the inquiry is not rigid or simplistic:

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.

> Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents. We have treated a nominally private entity as a state actor when it is controlled by an agency of the State, when it has been delegated a public function by the State, when it is entwined with governmental policies, or when government is entwined in [its] management or control.

Id. at 295–96.

In its motion for summary judgment, Defendant argues that Plaintiffs have failed, as a matter of law, to show that Defendant qualifies as a state actor under any of the "tests" recognized by the Sixth Circuit or suggested by Supreme Court precedent. In response, Plaintiffs argue only that they have pointed to facts in the record that constitute circumstantial evidence from which a jury could conclude that Defendant is a state actor under either the "state compulsion/nexus test" (Doc. No. 143, at 3) or the "symbiotic-relationship test" (id. at 11–19). The Court finds that a "genuine dispute of material fact," Fed. R. Civ. P. 56(a), regarding whether Defendant qualifies as a state actor under the state compulsion test that precludes summary judgment. Having reached that conclusion, it is not necessary to address whether Defendant qualifies as a state actor under the other tests.

### 2. The State Compulsion Test

The state-action analysis "begins by identifying the 'specific conduct of which the plaintiff complains.'" Am. Mfg. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51 (1999) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)). The Supreme Court and the Sixth Circuit have consistently held, in cases involving extensive state regulation of a private activity that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." Id. at 52. A private insurer, such as the Defendant in this case, "will not be held to constitutional standards unless there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." Id. For purposes of the state compulsion test, the question of whether such a close nexus exists "depends on whether the State has exercised coercive power or has provided such significant encouragement, either overt

or covert, that the choice must in law be deemed to be that of the State." Id. Conversely, an action taken by the Defendant "with the mere approval or acquiescence of the State" cannot be deemed a state action. Id.

Here, Plaintiffs argue that a number of internal emails sent among Defendant employees, prior to and during the time Defendant was in the process of building its network of providers, strongly suggest that State officials covertly "exercised coercive power or . . . provided such significant encouragement" to Defendant that it exclude Plaintiffs from the network, that there is at least a question of fact on whether Defendant's decision must be deemed a state action. (See Doc. No. 143, at 3–4.) Defendant insists that the inferences Plaintiffs ask the Court to draw from the email exchanges are unreasonable and unwarranted in light of the other evidence in the record refuting the suggestion that State officials had any involvement in Defendant's formulation of its provider network generally or, specifically, in the decision not to invite Plaintiffs to join that network. (See Doc. No. 179, at 6–10.) Defendant also argues that, even if all inferences are drawn in Plaintiffs' favor, the emails to which Plaintiffs rely do not establish state compulsion.

The evidence that Plaintiffs presents includes the following:

- On December 20, 2012, Cheryl Polmatier, the individual DentaQuest claims was primarily responsible for the decision to exclude Plaintiffs, wrote an email stating that various employees of DentaQuest need to "have an internal discussion based upon concerns that Todd [Cruse], Mark [Sniegocki] and Bob [Lynn] shared about the State's position on large groups, Snodgrass and others that we need to 'keep out' of the network." (Doc. No. 145-4, at 16–17, 22, Polmatier Dep. 111:23-116:15 & Ex. 17.)

- On December 27, 2012, Polmatier wrote: "**It's my understanding from previous conversations that there are certain providers and large provider groups that Tenncare would prefer that we not have in our network.** . . . Let me know who knows which offices (besides Snodgrass), and from there we can reach out to Ron Price and understand what position we need to take in communication regarding our network build for Tenncare."

(Doc. No. 145-4, at 18, 25, Polmatier Dep. 121:2-125:22 & Ex. 18.)

- In the first of two emails sent on January 8, 2012 to Bob Lynn, Mark Sniegocki, and in-house counsel for DentaQuest, Polmatier wrote: "If we wanted to amend any CoverKids provider [to include in TennCare], with the exception of Snodgrass (33 providers), we'd be amending approximately 720 unique providers to participate in TennCare. . . . If we know who we want to invite, I think we could start to amend . . . but it will create noise for anyone we don't invite who wants in. But if we're going to amend the entire CK network, everyone but Snodgrass, I think it wouldn't hurt to start now . . . ." (Doc. No. 145-1, at 3.)

- In the second email, sent at 1:09 p.m., she stated: "As Mark and I chat further, we don't know who the other providers are specifically that the State is not interested in. What we do know is that they are not fans of the mobile units, large group practices . . . . If we want to take our time with this approach, then we should not send out any amendments today, and await the analysis and any further information from the state/Gilcrest [sic] on who they don't want to work with. (Doc. No. 145-1, at 1–2.)

Plaintiffs argue that these emails alone constitute substantial circumstantial evidence that the "State's position," communicated to Defendant months before it was awarded the contract in May 2013, "coerced or significantly encouraged" Defendant to exclude Plaintiffs from its network. Plaintiffs further argue that the coercive effect of the State's communication was magnified because Defendant was in the process of bidding for a State contract worth over $38 million. (See Doc. No. 124-2, DentaQuest Contract at 1.)

Defendant asserts that the emails suggest, at worst, that the State "shared its position" or "provided information" regarding provider selection or, in one email, "pressur[ed]" Defendant not to invite Plaintiffs into the provider network. (Doc. No. 214, at 8.) Such "generic 'pressure'" and "sharing information," according to Defendant, do not satisfy the state compulsion test. The standard, as set forth above, is whether the State exercised "such coercive power or provide[d] such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." Lansing v. City of Memphis, 202 F.3d 821, 829 (6th Cir. 2000); Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir. 1992). Defendant insists that the

coercion or encouragement must be so strong that the action is deemed to be the state's own. (Doc. No. 214, at 8 (citing <u>Lansing</u>, 202 F.3d at 829)). The reasonable inference that must be drawn in Plaintiff's favor from the email chains at issue here, however, is that someone from the State, either James Gillcrist or someone acting at his direction, covertly pressured or provided significant encouragement to Defendant to formulate its provider network in such a way as to exclude Plaintiffs.

Defendant further argues, however, that whatever inferences in Plaintiffs' favor might be drawn from the emails are refuted by the actual testimony of the witnesses involved. Specifically, it points out that Cheryl Polmatier testified unequivocally that she did not speak to any Tennessee government official about Dr. Snodgrass or Snodgrass-King prior to 2013 (Doc. No. 181-1, Polmatier Dep. at 34:3–6); that she never had discussions with anyone at the State prior to the formation of the network (Polmatier Dep. at 116:1–2, 142:22–24); that Todd Cruse, Mark Sniegocki, and Bob Lynn shared the State's position regarding large groups generally, but it was part of her strategy alone to keep Snodgrass-King and Dr. Snodgrass out of the network (Polmatier Dep. at 116:3–10); that Barry Major, who reported to Polmatier, did not discuss the RFP with any TennCare officials prior to the RFP response (Doc. No. 181-2, Major Dep. 131:9–17); and that James Gillcrist testified via declaration that he "did not discuss or raise Dr. Snodgrass or Snodgrass-King Pediatric Dental Associates, P.C. with anyone at DentaQuest USA in relation to the development of their dental provider network for the TennCare–DentaQuest Contract" (Doc. No. 124, Gillcrist Decl. ¶ 18.)

Defendant also argues that Polmatier's insistence that she never spoke with any state officials about the RFP is consistent with the emails themselves, insofar as she states that "Todd, Mark and Bob" had shared information about the State's position on large provider groups (<u>see</u>

Doc. No. 145-4, at 22, 12/20/12 email), and Todd Cruse testified that his knowledge regarding the State's position was based on his prior employment with a provider in 2003. (Doc. No. 214-1, Cruse Dep. 174:20–175:5.) Defendant maintains that the context of the email that refers to awaiting "further information from the state/Gilcrest" is elucidated by a separate email message from Michele Blackwell, explaining that she did "not believe any of us know specific vendors to date. However, what will more than likely happen is once TennCare chooses its dental vendor they will provide a list of provider offices which have significant UR issues and ask the vendor take this into account when finalizing its network." (Doc. No. 145-4, at 24 (Jan. 17, 2013 email from M. Blackwell to C. Polmatier). Defendant argues that Plaintiffs' proposed "inferences" from the referenced emails are not merely unpersuasive but are also contradicted by the "actual evidence" in the case. (Doc. No. 179, at 9.) Defendant also argues that Plaintiffs' proposed inferences amount to nothing more than rank speculation and "wholly unsupported allegations." (Id. at 10.) In its objections to the R&R, Defendant further insists that Plaintiffs' proposed inferences are improbable and rest on the mere possibility that numerous Defendant employees and high-ranking State officials perjured themselves when they testified that there was no collusion involved in the formation of Defendant's provider network.

Plaintiffs' theory is not predicated solely on "wholly unsupported allegations" or rank speculation. It is based on circumstantial evidence, which is still evidence that must be considered by the finder of fact. In reviewing a motion for summary judgment, the Court must view *all evidence*—direct and circumstantial—in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Jones v. Potter, 488 F.3d 397, 407 (6th Cir. 2007) ("Simply because evidence is not 'direct'—in that its meaning cannot be understood without one or more inferential steps—does not render that

evidence insufficient to defeat summary judgment."). The Court does not find Plaintiffs' proposed inferences to be completely implausible. Certainly, Defendant's proposed interpretation of the emails is also plausible as well as consistent with Defendant's witnesses' testimony, but resolution of which in inference should be adopted is properly left to the finder of fact at trial.

This is not a situation in which the proponent of a theory offers no evidence whatsoever in support of such theory other than a blanket assertion that all witnesses whose testimony refutes the theory must be lying. If the emails did not exist—if Plaintiffs truly had *no* evidence to support their assertion that the State coerced or significantly encouraged and influenced Defendant's decision and instead simply speculated that all of Defendant's witnesses are lying—then summary judgment in Defendant's favor would be warranted. Gillham v. Tenn. Valley Auth., 488 F. App'x 80, 86 (6th Cir. 2012) ("To survive summary judgment . . . [a] party may not rest on speculation or a 'mere possibility' of a factual dispute."); Rand v. CF Indus., Inc., 42 F.3d 1139, 1147 (7th Cir. 1994) (affirming summary judgment, noting that the plaintiff "cannot avoid summary judgment merely by asserting that [the defendant's] executives are lying. Rather, Rule 56 requires Rand to produce specific facts that cast doubt upon [the defendant's] stated reasons for its action or raise significant issues of credibility."); Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992) ("It is now quite well-established that, in order to withstand a motion for summary judgment, the party opposing the motion must present 'affirmative evidence' to support his/her position."). That is not the situation with which the Court is confronted.

A genuine issue of material fact precludes summary judgment on the issue of whether Defendant qualified as a state actor under the state compulsion test. Defendant's motion for

summary judgment on the basis of this issue will be denied.

**B.      Equal-Protection Claim**

The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause prevents states from making distinctions that: (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." Johnson v. Bredesen, 624 F.3d 742, 746 (6th Cir. 2010).

Typically, to state an equal-protection claim where neither a suspect class nor a fundamental right is implicated, as here, Plaintiff must establish that: (1) the state actor intentionally treated the plaintiff differently from others similarly situated; (2) this difference in treatment was caused by the plaintiffs' membership in a particular, identifiable class; and (3) this different treatment was not rationally related to a legitimate state interest. Srail v. Vill. of Lisle, Ill., 588 F.3d 940, 943 (7th Cir. 2009); see also Davis v. Prison Health Servs., 679 F.3d 433, 440 (6th Cir. 2012) ("In typical equal protection cases, plaintiffs 'generally allege that they have been arbitrarily classified as members of an 'identifiable group.'" (quoting Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008)).

In this case, Plaintiffs asserted two separate but related equal protection claims in the Complaint. First, they alleged that Defendant's policy of excluding entities and providers that own or operate multiple practice locations (the "Multiple-Locations Restriction") was new, that no previous DBM contract with TennCare included a Multiple-Locations Restriction (Compl. ¶ 25), and that, through the creation and application of the Multiple-Locations Restriction, Defendant "singled out for disparate treatment" dental providers like Plaintiffs who own or

operate more than one dental office location (Compl. ¶ 77). In other words, this equal protection claim was premised upon Plaintiffs' belonging to a recognizable class—a class of dentists and dental offices that operate in more than one office location—that was treated differently from other dentists and dental offices. Plaintiffs alleged that the Multiple-Locations Restriction's discrimination against multi-office practitioners bore no rational relationship to any legitimate government purpose and therefore violated their rights under the Equal Protection Clause. (Compl. ¶ 79.)

Second, Plaintiffs alleged that Defendant "crafted and/or . . . selectively enforced the Multiple-Locations Restriction with the specific intent of excluding Plaintiffs from the TennCare dental provider network" and that this selective enforcement was without rational basis and was carried out "solely because of the animus and ill-will Defendants hold and have held toward Plaintiffs since approximately 1998." (Compl. ¶ 80.) In other words, Plaintiffs also asserted a class-of-one equal protection claim.

Judge Haynes granted Defendant's motion to dismiss Plaintiffs' class-of-one equal protection claim but denied the motion to dismiss the equal protection claim based on Plaintiffs' allegation that Defendant discriminated against it by excluding it from its provider network based on its membership in an identifiable class—the class of dentists and dentists offices that have multiple office locations—and that this discrimination lacks a rational basis. The Magistrate Judge denied summary judgment on the remaining claim because there was a disputed issue of material fact as to the true reason for keeping Plaintiffs out of the network:

> Defendant's reason for excluding Snodgrass-King from the provider network is a material fact to this equal protection claim and is genuinely disputed. DentaQuest may be correct that the large provider rule was the impetus for not inviting Snodgrass-King into the network. On the other hand, a rational trier of fact could also agree with Snodgrass-King's "animus or ill-will" theory, finding that Dr. Snodgrass' constitutionally protected speech motivated the exclusion and that the

large provider rule is merely a cover.

(Doc. No. 211, at 16.)

Defendant objects to the Magistrate Judge's finding and recommendation. The Court reconsiders de novo Defendant's motion for summary judgment on the equal-protection claim.

In its motion for summary judgment, Defendant posited that the Multiple Locations Restriction was based on "several established sound bases." (Doc. No. 121, at 17.) More specifically, Defendant argued that

> A provider network must offer adequate access to its membership, and such access is a specific requirement under the 2013 Contract. Measuring access, however, is far more complex with a multiple-location practice because the number of dentists at any given location varies by the day. For example, if a practice has ten dentists and five locations, there is no automated way to calculate the number of dentists—and therefore the level of access—at a given location since it could be evenly spread (i.e., 2-2-2-2-2), unevenly spread (e.g., 5-2-1-1-1), or completely variable by the day. As such, a DBM [Dental Benefits Manager] cannot determine with any predictability if an access requirement has been met. In addition, multiple location practices increase credentialing costs because a dentist must be credentialed (and periodically updated) for each individual location, thus multiplying the administrative costs by the number of locations. Given limited resources and cost-savings concerns, it is plainly rational for the government to prefer practices without multiple locations, particularly given that multiple-location practices can still be invited if access needs demand it.

(Doc. No. 121, at 17 (citing Def.'s Statement of Undisp. Facts, Doc. No. 122, at ¶¶ 43, 47, 77–79.)

In response, Plaintiffs do not refute Defendant's argument that the Multiple-Locations Exclusion was rationally related to legitimate objectives. Instead, Plaintiffs argue that the dental providers at Snodgrass-King "were excluded from the DentaQuest Network solely because they were in a dental group with Dr. Snodgrass using selective enforcement of DentaQuest's rules and discretion." (Doc. No. 143, at 32.) They point out that, although other multi-office providers were initially not invited into the network, in the end, only Snodgrass-King was not invited.

Plaintiffs argue that this evidence refutes Defendant's assertion that the exclusion of Snodgrass-King was solely based on its multiple office locations:

> The only reason that DentaQuest has given for not including a single Snodgrass-King provider at any Snodgrass-King location in the DentaQuest Network is the Large Provider Rule. While DentaQuest provides multiple arguments for why the Large Provider Rule is rationally related to a legitimate government end, these arguments rest upon the faulty premise that the Large Provider Rule was the actual reason that Plaintiffs were excluded. This material fact – the actual reason Plaintiffs were excluded – is not undisputed. As more fully outlined above in support of Plaintiffs' First Amendment claim, it is Plaintiffs' position that they were excluded from the DentaQuest Network because of the tumultuous relationship between Dr. Snodgrass and the DentaQuest corporate family, or, as Polmatier put it around the time she admits to forming the intent to exclude Dr. Snodgrass from the DentaQuest Network, "[w]e had an issue with a problem provider, Dr. Snodgrass, and long story short, he sued us to participate with Tenncare . . . ." Thus, the reason why Plaintiffs were excluded from the DentaQuest Network is disputed.

(Doc. No. 143, at 33 (citations to the record omitted).)

Plaintiffs do not challenge that the Multiple-Locations Restriction is rationally related to Defendant's legitimate business objectives. Plaintiffs, in fact, no longer contend that they were excluded from the network because of the Multiple-Locations Restriction. Instead, they argue that the Multiple-Locations Restriction is simply a pretext, that it was selectively enforced against them, and that the real reason for the disparate treatment is animus or ill will toward Dr. Snodgrass in particular and Snodgrass-King generally. However, this "selective enforcement" argument is the hallmark of Plaintiffs' class-of-one claim as originally articulated in the Complaint, which was dismissed by Judge Haynes. (See Compl. ¶ 80.) The Court finds that Plaintiffs have effectively abandoned their original equal protection claim, which was premised solely upon the lack of a rational basis to support Defendant's disparate treatment of multi-office dental practices. (See Compl. ¶ 77.) Instead, Plaintiffs have retreated back to their class-of-one claim—which was previously dismissed by Judge Haynes. The Court will reject the Magistrate

Judge's recommendation and grant summary judgment in Defendant's favor on the equal protection claim.

### C. First Amendment Claim

To prevail on a First Amendment retaliation claim, a plaintiff must establish that

> (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.

Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012) (citation omitted). A retaliatory motive may be inferred from circumstantial evidence, such as "the timing of events or the disparate treatment of similar individuals." Paterek v. Vill. of Armada, Mich., 801 F.3d 630, 645 (6th Cir. 2015).

Plaintiffs allege two different types of constitutionally protected conduct: (1) speaking out against Defendant's administration of TennCare; and (2) filing two lawsuits against Defendant's corporate affiliate when it was administering TennCare. Defendant's refusal to invite Plaintiffs into the new TennCare network was an adverse action that would deter a person of ordinary firmness from engaging in the protected activities. Plaintiffs further allege that their exclusion from the network is causally linked to the protected activity. In their motion for summary judgment and in their objections to the R&R, Defendant asserts that Plaintiffs have no evidence "beyond . . . mere conjecture" to link Defendant's refusal to invite them into the network and their past protected activity. (Doc. No. 121, at 18; Doc. No. 214, at 12.)

Having reviewed the factual record as a whole, the Court finds that material factual disputes preclude summary judgment on this issue. Plaintiffs have succeeded in presenting circumstantial evidence from which the finder of fact could reasonably infer that Defendant was motivated at least in part by Plaintiffs' protected activities from inviting them into the network.

That evidence largely consists of the numerous emails along with other documentation to which Plaintiffs rely in their response in opposition to the motion for summary judgment, some of which is also referenced above. See e.g., (Doc. No. 145-4, at 16–17, 22, Polmatier Dep. 111:23–116:15 & Ex. 17.); (Doc. No. 145-7, at 2–3, 5, Cruse Dep. at 190:23-191:3, 192:2–195:17 & Ex. 7.); (Doc. No. 145-1, at 3.); (Doc. No. 145-9, at 18–19, 29, Major Dep. at 201:15-203:22 & Ex. 8); (Doc. No. 132-3, at 23–25, Major Dep. at 211:13–212:3, 216:7–14; Doc. No. 132-5, at 34, Major Dep. Ex. 9.); (Doc. No. 145-6 ¶ 45.); and (Doc. No. 132-3, at 26–28, Major Dep. at 228:5–18, 229:22–230:22; Doc. No. 132-5, at 36, Major Dep. Ex. 11.)

Material factual disputes exist on Plaintiffs' First Amendment retaliation claim. Defendant's motion for summary judgment on that claim must be denied.

### D.    Due-Process Claim

Plaintiffs object to the Magistrate Judge's recommendation granting summary judgment to Defendant on its procedural due process claim and denying Plaintiffs' motion for summary judgment on the same claim.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. This Amendment has been construed to protect the right to "procedural" due process and substantive due process. Midkiff v. Adams Cnty. Reg'l Water Dist., 409 F.3d 758, 762 (6th Cir. 2005) (citation omitted). Plaintiffs here bring a procedural due process claim under the Fourteenth Amendment.

To establish a procedural due process violation under 42 U.S.C. § 1983, Plaintiffs must demonstrate three elements: (1) that they had a protected property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that they were deprived of that protected property interest within the meaning of the Due Process Clause; and (3) that the State did not

afford it adequate procedural rights before depriving it of its protected property interest. Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio, 610 F.3d 340, 349 (6th Cir. 2010). At issue here is whether Plaintiffs can establish that that had a property interest protected by the Fourteenth Amendment that was implicated by Defendant's refusal to invite them to join its provider network.

Property rights are not created by the Constitution. Rather, they are created and defined by independent sources—typically state law. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead have a legitimate claim of entitlement to it." Id. "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 756 (2005).

Plaintiffs contend that Tenn. Code Ann. § 71-5-118(a) ("Section 118(a)") creates a constitutionally protected property interest in their favor. Section 118(a) states:

> (a) The commissioner of finance and administration has the authority to enter into contracts with qualified vendors to provide to eligible recipients medical assistance allowed under § 71-5-107 [including basic dental care services]. The commissioner has the authority to terminate or suspend existing contracts with providers, to refuse to enter into contracts with providers, and to recover any payments incorrectly paid if the commissioner finds that such actions will further the purpose of this section. Any action against such provider shall be treated as a contested case in accordance with the Uniform Administrative Procedures Act, compiled in title 4, chapter 5. If a hearing is requested by the provider, it shall be held prior to the imposition of any of the sanctions of this subsection (a), except that upon a finding by the commissioner that the public health, safety, or welfare imperatively requires emergency action, these sanctions may be imposed pending an opportunity for the provider to request a prompt hearing. Furthermore, the commissioner has the right to set off any money incorrectly paid against any claim for money submitted by the provider pending an opportunity for a hearing. Grounds for action against providers under this subsection (a) include, but are not limited to, the following:

> (1) Violation of the terms of the contract;
>
> (2) Violation of any provision of this part or the rules promulgated pursuant to this part;
>
> (3) Billing for medical assistance that was not delivered;
>
> (4) Provision of medical assistance that is not medically necessary or justified;
>
> (5) Provision of medical assistance of a quality that is below professionally recognized standards;
>
> (6) Revocation or suspension of a provider's professional license or other disciplinary action by the agency regulating the profession of the provider; and
>
> (7) Failure to produce records, upon request, by authorized representatives of the commissioner as necessary to substantiate the medical assistance for which claims have been submitted.

Id.

According to Plaintiffs, this statute grants the Commissioner, and only the Commissioner, the authority to contract with a network of dental providers, terminate those network providers, or refuse to allow providers into the network. The Commissioner's authority is then limited in two ways: (1) none of the enumerated actions can be taken until the Commissioner finds the purposes of the Act will be furthered by such action; and (2) the Commissioner's finding in this regard can be challenged by an aggrieved provider if the provider requests a contested case in accordance with the Uniform Administrative Procedures Act. (Doc. No. 130, at 9.) Plaintiffs believe that this statute governs their claim because they had a preexisting property interest in providing dental care to TennCare patients from April 2009 through December 2013, when Defendant sent notice that Plaintiffs were not invited to join Defendant's provider network. Plaintiffs contend that, once they had been conferred the benefit of being TennCare providers under § 71-5-118(a), then they could only be deprived of that benefit in accordance with the procedures prescribed by the statute. Plaintiffs also argue that the powers granted to the

20

Commissioner through Section 118(a), specifically the authority to "refuse to enter into contracts with providers" and to "terminate those network providers," has been delegated to Defendant and that Defendant's refusal to contract with Plaintiffs constitutes a "sanction" under Section 118(a) with respect to which the procedures established by the Uniform Administrative Procedures Act ("UAPA") attach. (Doc. No. 130, at 11; Doc. No. 171, at 10.)

Plaintiffs' arguments are not supported by the statutory textual words or by rules of statutory construction. By its terms, Section 118(a) grants the Commissioner of Finance and Administration the authority to enter into contracts and to impose sanctions against providers for various violations, including improper billing, unjustified or low quality care, breach of contract, and violations of law. Tenn. Code Ann. § 71-5-118(a). If the Commissioner elects to impose such sanctions, the action is treated as a contested case under the UAPA. Id. Section 118(a) does not authorize Defendant or any other managed care entity to impose sanctions. This conclusion is further supported by the language of the implementing rule, entitled "Provider Sanctions," which states in pertinent part:

> (1) Pursuant to the authority granted by T.C.A. § 71-5-118 to the Commissioner to impose sanctions against providers, the Commissioner, through the Bureau, may take the following actions against a provider upon a finding that such actions will further the purpose of the Tennessee Medical Assistance Act:
>
> (a) Subject providers to stringent review and audit procedures which may include clinical evaluation of claim services and a prepayment requirement for documentation and for justification of each claim;
>
> (b) Refuse to issue or terminate a Tennessee Medicaid Provider Number if any person who has an ownership or controlling interest in the provider, or who is an agent or managing employee of the provider, has been convicted of a criminal offense related to that person's involvement in any program established under Medicare, Medicaid or the U.S. Title XX Services Program;
>
> (c) Refuse to issue or terminate a Tennessee Medicaid Provider Number if a determination is made that the provider did not fully and accurately make any disclosure of any person who has ownership or controlling interest in the

provider, or is an agent or managing employee of the provider and has been convicted of a criminal offense related to that person's involvement in any program under Medicare, Medicaid or the U.S. Title XX Services Program since the inception of these programs . . . .

(2) In addition to the grounds for sanctions set out in T.C.A. § 71-5-118, activities or practices which justify sanctions against a provider and may include recoupment of monies incorrectly paid shall include but not be limited to:

(a) Noncompliance with contractual terms;

(b) Billing for a service in a quantity which is greater than the amount provided;

(c) Billing for a service which is not provided or not documented;

(d) Knowingly providing incomplete, inaccurate, or erroneous information to TennCare or its agent(s) . . . .

Tenn. Comp. R. & Regs. 1200-13-18-.08(1)–(2).

This Court must consider "the general rules of statutory construction embraced" by the State. Id. In Tennessee, "[t]he basic rule of statutory construction is to ascertain and give effect to the intent or purpose of the legislature as expressed in the statute." Id. (quoting State v. Camacho, No. E2005-02699-CCA-R3-CD, 2007 WL 3145003, at *7 (Tenn. Ct. Crim. App. Oct. 29, 2007)). On its face, Section 118(a) applies only to actions taken by the Commissioner of Finance and Administration. This particular statute does not authorize the Commissioner to contract with providers. Other sections of the TennCare statute cover that power, which clearly is delegable to the managed care contractors ("MCCs"). Section 118(a) instead grants the Commissioner the sole authority to refuse to contract with providers, to suspend provider contracts, and to terminate provider contracts *as a sanction*. It does not govern the ability of MCCs to contract with providers or their authority to refuse to contract with providers for reasons other than as a "sanction." Nothing in the language of Section 118(a) extends to or references MCCs like Defendant or authorizes or restricts their actions. In contrast, other

Tennessee Code provisions specifically apply to MCCs. See, e.g., Tenn. Code Ann. §§ 71-5-117 (authorizing MCCs to require certain information related to third-party coverage), 71-5-191 (authorizing MCCs to participate in the development of uniform claims processes), and 71-5-2603 (requiring MCCs to report acts of fraud). There are no words in Section 118(a) to support a conclusion that it concerns MCCs ability to contract with providers or suggests that the Commissioner delegated authority to the MCCs to issue "sanctions."

To conclude otherwise would conflict with other parts of the TennCare statute and rules. Plaintiffs concede that the TennCare statute does not require that DBMs include in the provider network every licensed provider who applies to be in the network. Further, under the TennCare regulations, "[a] provider of services may not appeal . . . [a]n MCC's refusal to contract with the provider." Tenn. Comp. R. & Regs. 1200-13-18-.01(2)(a). As the Magistrate Judge observed: On one hand, a provider may request a hearing if the Commissioner refuses to enter into the contract with the provider *as a sanction*; on the other hand, a provider may not appeal a DBM's refusal to contract with the provider. (Doc. No. 211, at 24–25.)

Even if, as Plaintiffs argue, Defendant's refusal to contract may be construed as an action taken by the Commissioner, the action was not a sanction and therefore is not governed by Section 118(a). The statute and its regulation list the type of conduct that may warrant sanctions as well as actions the Commissioner may take in response to such conduct. Neither party argues that Plaintiffs were involved in any behavior that warranted sanctions.

Finally, Plaintiffs' argument that they had a preexisting property interest that gave rise to due process protection rights lacks merit. Plaintiffs' contract with Delta Dental, the TennCare DBM from 2010 through 2013, was terminable at will and also terminated by its own terms when Delta Dental ceased being the DBM. Although Plaintiffs continued to provide services to

TennCare patients for a few months after the DentaQuest contract went into effect and before Defendant had finalized its provider network, that fact alone did not create a property right in continuing to be a TennCare provider. The Sixth Circuit has concluded that participation in a state Medicaid program does not create a property interest protected by due process. Latimer v. Robinson, No. 04-5828, 2005 WL 1513103, at *1 (6th Cir. June 21, 2005). As the First Circuit recognized long ago, Medicare and Medicaid programs are simply "governmental insurance program[s]" intended to benefit those who are eligible for services under them. Cervoni v. Sec'y of Health, Educ. & Welfare, 581 F.2d 1010, 1018 (1st Cir. 1978). Healthcare practitioners who provide those services, they are not the intended beneficiaries of the programs, and "do not have a protectable property interest in their continuing eligibility to bill for reimbursement . . . ."

### E.    Compensatory and Punitive Damages

The Court adopts the Magistrate Judge's findings and conclusions on whether Plaintiff may recover compensatory or punitive damages.

## IV.    CONCLUSION

The Court has reviewed de novo the parties' summary judgment motions. Having done so, the Court will deny Plaintiffs' Motion for Summary Judgment (Doc. No. 129) on the procedural due process claim. The Court will grant in part and deny in part Defendant's Motion for Summary Judgment. (Doc. No. 121). Defendant's motion is granted on Plaintiffs' procedural due process claim and equal protection claims, denied on the issue of state action, the First Amendment retaliation claim, and the claims for compensatory and punitive damages.

An appropriate order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE